Jose Fernando **DIAZ**, et al., and on behalf of all persons similarly situated, Plaintiffs,

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Department of Justice, United States of America, David Ilchert, District Director of the San Francisco District of the Immigration and Naturalization Service, Alan Nelson, Commissioner of the Immigration and Naturalization Service, and Edwin Meese, Attorney General, Defendants.**

No. Civ. S–83–436 LKK.

United States District Court, E.D. California.

Sept. 26, 1986.

*See Cook Associates, Inc. v. Lexington United Corp.*, 87 Ill.2d 190, 197, 57 Ill.Dec. 730, 733, 429 N.E.2d 847, 850 (1981).

Norman C. Hile, Kenneth C. Mennemeier, Orrick, Herrington & Sutcliffe, Sacramento, Cal., James F. Smith, Immigration Law Clinic, Davis, Cal., Robert Rubin & Ignatius Bau, National Refugee Rights Project San Francisco Lawyers' Committee

for Urban Affairs, San Francisco, Cal., for plaintiffs.

R. Steven Lapham, Asst. U.S. Atty., Glyndell Earl Williams, Sp. Asst. U.S. Atty., I.N.S., Sacramento, Cal., for defendants.

## ORDER

KARLTON, Chief Judge.

██ This action was brought by a group of aliens, primarily from Central America, who seek permission to work in the United States pending resolution of their applications for political asylum. A class was certified in *Diaz v. INS*, No. 83–436–LKK, slip op. at (E.D.Cal. March 20, 1986). Three sub-classes are represented by plaintiffs: (1) all asylum applicants who have requested work authorization pursuant to 8 C.F.R. § 109.1(b)(2) (1986) or 8 C.F.R. § 208.4 (1986), and have had, or will have, their requests denied by the San Francisco District of the Immigration and Naturalization Service ("INS"); (2) all asylum applicants who have had, or will have, previously granted work authorizations revoked by the San Francisco District of the INS; and (3) all asylum applicants who have had, or will have, their work authorization requests not timely processed by the San Francisco District of the INS. The case is now before the court on plaintiffs' motion for preliminary injunction.[1]

## I

## FACTUAL BACKGROUND [2]

The factual backgrounds relative to the representative plaintiffs present variations on a single tragic theme. All have fled their homelands to escape what they perceive to be political or religious persecution and possible death. The majority are from El Salvador. One each is from Guatemala and China. All have applied for political asylum in the United States and all have requested permission to legally work in this country until the INS has processed their asylum applications, a process which may take years.

Jose Fernando Diaz and his wife fled from El Salvador because Jose was involved with "ANDES," a teachers' union whose members have been subject to government persecution. According to his declaration, one uncle and a brother were killed because of their political involvement. Another brother was arrested and tortured. Diaz applied for work authorization when he arrived in the United States and, after some delay, it was granted. It was subsequently revoked after the INS district director determined that Diaz failed to qualify as a refugee.

Juan Jose Fuentes states that he was active in a labor union in El Salvador and a member of a political group "organized against social unjustice." Many of his colleagues were killed or "disappeared" for their activities. The INS informed Fuentes by letter that his request for work authorization would be denied. The letter stated, *inter alia*, that:

> The only apparent reason you have demonstrated in your case to be granted work authorization is to support yourself

---

**1.** The government argues that the issues involved in this action are non-justiciable political questions under *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The argument is not persuasive. The Administrative Procedure Act, 5 U.S.C. § 702 (1982), provides for judicial review and injunctive relief for "[a] person suffering legal wrong because of agency action." Actions of the INS are routinely subjected to scrutiny by the courts, and the Ninth Circuit has never been reluctant to permit an injunction barring the application of an INS regulation under the proper circumstances. *See, e.g., Nat'l Center for Immigrants Rights, Inc. v. INS*, 743 F.2d 1365 (9th Cir.1984). In a recent case, *Bowen v. Mich. Academy of Family Physi-*

cians, — U.S. —, 106 S.Ct. 2133, 2135, 90 L.Ed.2d 623 (1986), the Supreme Court reaffirmed that there exists a "strong presumption that Congress intends judicial review of administrative action."

**2.** The facts set forth in this section are taken from the declarations of the plaintiffs and correspondence to plaintiffs or their representatives from the INS. The content of the correspondence from the INS is undisputed. The circumstances described by the plaintiffs in their declarations and set forth here constitute findings for preliminary relief purposes only.

while you remain illegally in the United States and pursue an asylum application that appears to have little merit. I conclude that the adverse factors in your case, namely, your circumvention of the normal refugee procedures for processing refugees abroad, your giving up a safe haven in Mexico, and your illegal entry into the United States, have not been overcome by countervailing equities.

Wai Hung Yew left the People's Republic of China because of his religious and political opinions. He contends that he was accused of anti-Communist activities based on his criticism of the Chinese Communist Party, and was tortured. Yew's request for work authorization was denied in part "because of the contemptuous manner in which he has circumvented the immigration laws [as a] stowaway and a shipjumper."

Jose Argumedo-Trujillo was a university student in El Salvador before he came to the United States. He says that he wrote a report critical of the government, after which the police allegedly came to his apartment, interrogated him, and kidnapped two of his roommates. The district director denied Argumedo-Trujillo's request for work authorization in part on the ground that the application had little merit, and in part on the ground that Argumedo-Trujillo had "failed to avail himself of apparent safe havens in either Guatemala or Mexico or to take advantage of normal procedures for applying for refugee or asylum status, but instead entered the United States illegally...."

Manuel Pineda Pedroza is a native of Guatemala. After his brother was killed by police during a demonstration, Pedroza asserts that he received numerous death threats and was fired from his government job because he was the brother of a "revolutionary." Pedroza's request for work authorization was denied after the district director received word from the Immigration Court that the Department of State had recommended denial of his asylum application.

Marlon Perez Reynosa is from El Salvador, where he had allegedly resisted efforts by both the military and a leftist organization to get him to join. His attempted neutrality apparently made him suspect on both sides. The district director denied Reynosa's request for work authorization after finding that the Immigration Court was unlikely to grant the request for asylum. The district director based the denial in part on Reynosa's apparent failure to take safe haven in Guatemala or Mexico, and his illegal entry into the country.

Eduardo Camacho Reynosa came to the United States from El Salvador, where he had attended meetings of ANDES. His brother-in-law, Secretary-General of ANDES, was allegedly kidnapped in 1980 and never seen again. Another brother-in-law was killed in 1981, and yet another was arrested that same year. Reynosa fears that the government will arrest him if he returns to El Salvador. The INS denied Reynosa's request for work authorization because the State Department made a preliminary finding that Reynosa had failed to establish a well-founded fear of persecution. One of the factors that entered into the INS decision was that Reynosa was not "responsible for the welfare of anyone except [himself]."

Teresa Duarte, a union member, fled El Salvador after allegedly having received death threats. Her uncle, cousin, and persons from her neighborhood have been killed because of their political activity. Duarte was initially granted work authorization, but the authorization was revoked after the district director denied her request for asylum.

Carlos Chavez-Pacas was allegedly forced to serve with ORDEN, the Salvadorean government's network of informers. He fears retaliation from anti-government forces should he return to El Salvador. The INS rejected Chavez-Pacas' application for work authorization on a number of grounds, including the preliminary assessment by the Bureau of Human Rights and Humanitarian Affairs of the Department of State that he had not established a well-

founded fear of persecution, that he did not appear to be responsible for the well-being of anyone except himself, and that he had worked in this country illegally for over four years.

Plaintiffs contend that the district director improperly denied the work authorization requests of Juan Jose Fuentes, Wai Hung Yew, Jose Argumedo-Trujillo, Manuel Pineda Pedroza, Marlon Perez Reynosa, Eduardo Camacho Reynosa, and Carlos Chavez-Pacas.[3] Plaintiffs also assert that the work authorizations of Jose Fernando Diaz and Teresa Duarte were impermissibly revoked.

## II

### STANDARDS FOR PRELIMINARY INJUNCTION[4]

The Ninth Circuit has articulated two interrelated tests for determining the propriety of issuing a prohibitory preliminary injunction.[5] Under the "traditional" test, the court may issue a preliminary injunction when (1) the moving party has demonstrated that it will probably prevail on the merits, (2) the moving party will suffer irreparable injury if injunctive relief is not granted, (3) in balancing the equities, the non-moving party will not be harmed more than the moving party is helped by the injunction, and (4) granting the injunction is in the public interest. *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 674–75 (9th Cir.1984).

█ Under the "alternative" test, the court may issue a preliminary injunction when the moving party demonstrates "*either* a combination of probable success on the merits and the possibility of irreparable

injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor." *Id.* The two prongs of the alternative test are not separate tests, but rather "are the ends of a continuum; the greater the relative hardship to the moving party, the less probability of success must be shown." *Nat'l Center for Immigrant Rights*, 743 F.2d at 1369. Under the second prong of the alternative test, even if the balance tips sharply in favor of plaintiffs, the moving party must show as an "irreducible minimum" that there is a "fair chance of success" on the merits. *Martin* at 740 F.2d 675.

Recent Ninth Circuit cases involving preliminary injunctions against the INS have relied on both the traditional test and the alternative test. *Compare Nat'l Center for Immigrants Rights*, 743 F.2d at 1369 (9th Cir.1985) (alternative test), *with Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir.1983) (applying both traditional and alternative tests). Under either test, the decision to grant or deny the preliminary injunction lies within the sound discretion of the district court. *Zepeda*, 753 F.2d at 724.

## III

### PRINCIPLES OF REGULATORY CONSTRUCTION

Resolution of plaintiffs' motion for preliminary relief requires a close examination of three INS regulations: 8 C.F.R. § 109.-1(b)(2) (1986); 8 C.F.R. § 208.4 (1986); and 8 C.F.R. § 109.2 (1986). These regulations were adopted pursuant to 8 U.S.C. § 1158(a) (1982) which provides that the Attorney General shall "establish a proce-

---

**3.** Since the filing of this application for a preliminary injunction on November 25, 1985, the district director has granted work authorization to three of the twelve named plaintiffs, Jorge Calderon Reyes, Vilma Conception Tursios-Martinez, and Rosa Amelia Reynosa Camacho.

**4.** Plaintiffs seek preliminary injunctive relief on behalf of the named plaintiffs only, and not on behalf of the class, despite a clear right to seek preliminary relief on behalf of the class. *See Nat'l Center for Immigrants Rights, Inc. v. INS*, 743 F.2d 1365, 1371 (9th Cir.1984). Defendants

have not objected to the scope of the relief sought. Accordingly, the relief granted by this order will apply only to the named plaintiffs.

**5.** Except for plaintiffs' request for an order requiring the INS to provide written findings of fact and conclusions of law, *see* section V–C, *infra*, and to reconsider the denials of plaintiffs' applications for work authorization, *see* n. 13, *infra*, the relief requested by plaintiffs is prohibitory in nature.

dure" for aliens to seek political asylum, see n. 8, *infra,* and 8 U.S.C. § 1103(a) (1982). *See* n. 10, *infra.* It is unclear whether the statute provides, in effect, congressional power to establish standards and, accordingly, whether the regulations should be viewed as "legislative" or "interpretative" in character.[6] As has been said, "[i]nterpreting a statute to determine whether it authorizes legislative rules is sometimes difficult." 2 *Administrative Law Treatise* § 7:8, at 42.

Although it is quite true that classification of a rule as legislative has broad significance, *see Joseph v. United States Civil Serv. Comm'n,* 554 F.2d 1140, 1152–53 (D.C.Cir.1977); *Sierra Club v. Watt,* 608 F.Supp. 305, 329 (E.D.Cal.1985), resolution of the character of the Attorney General's regulations does not appear to be necessary in the instant case. Neither party challenges the validity of the regulations in this case,[7] but rather, the case turns on their interpretation. The court thus assumes the validity of the regulations, and under the configuration tendered, treats them as governing disposition of the matter.

■ Given the posture of the case noted above, it appears appropriate to interpret the regulations by application of the standard canons of statutory construction. Thus, assuming that the regulations are consistent with the statute, the court is to construe an administrative regulation to effectuate the central purpose of the enacting body. *United States v. Christensen,* 419 F.2d 1401, 1403 (9th Cir.1969). In determining the meaning of the regulation, the court is to examine the language of the regulation, the legislative history, and the practical consequences of any suggested interpretation. *Id.* at 1403–04. The words used in the regulation are to be given their plain and ordinary meaning, *Malat v. Riddell,* 383 U.S. 569, 571, 86 S.Ct. 1030, 1032, 16 L.Ed.2d 102 (1966), and if possible all ambiguities are to be resolved in favor of an interpretation consistent with the statutory and regulatory scheme. *See United Telecommunications, Inc. v. Comm'r of Internal Revenue,* 589 F.2d 1383, 1390 (10th Cir.1978), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2839, 61 L.Ed.2d 284 (1979). Moreover, the court is to pay appropriate attention to the interpretation of the agency responsible for enacting the regulation. Thus, an agency's interpretation of its own regulations is entitled to deference unless "plainly erroneous or inconsistent with the regulation" or statute. *See United States v. Larionoff,* 431 U.S. 864, 872–73, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977).

■ Nonetheless, it is equally clear that the deference due an agency's interpretation is not "equivalent to the presumption of constitutionality afforded legislation." *Motor Vehicle Mfrs. Assn. v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43 n. 9, 103 S.Ct. 2856, 2866, n. 9, 77 L.Ed.2d 443. Nor need the court place great weight on an agency interpretation in conflict with an earlier pronouncement by the agency. *Gen. Elec. Co. v. Gilbert,* 429 U.S. 125, 143, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1976). *See, e.g., Flint v. State of California,* 594 F.Supp. 443, 448 n. 6 (E.D.Cal.1984). Put another way, the deference due an agency's interpretation of its regulations does not relieve the court of its duty to construe the regulation, for construction of a regulation is a legal determination and the "final

---

6. "A legislative rule is the product of an exercise of delegated legislative power to make law through rules. An interpretive rule is any rule an agency issues without exercising delegated legislative power...." 2 K. Davis, *Administrative Law Treatise* § 7:8, at 36 (2d ed. 1979). *Compare Gen. Elec. Co. v. Gilbert,* 429 U.S. 125, 141 and n. 20, 97 S.Ct. 401, 410 and n. 20, 50 L.Ed.2d 343 (1976) (statute providing agency with authority to adopt "suitable procedural regulations" did not confer authority to promulgate legislative rules) *with Batterton v. Francis,* 432 U.S. 416, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977) (statute delegating authority to prescribe "standards" authorized issuance of legislative rules).

7. Plaintiffs seek to enforce the rules, and the defendants obviously are bound by them. *See Confederated Tribes and Bands of Yakima Indian Nation v. Fed. Energy Regulatory Comm'n,* 746 F.2d 466, 474 (9th Cir.1984), *cert. denied,* 471 U.S. 1116, 105 S.Ct. 2358, 86 L.Ed.2d 259 (1985).

determination of a question of law is for the courts." *Sierra Club v. Watt*, 608 F.Supp. at 330. Thus, "the agency's interpretations are not conclusive, and courts are not bound by them." *Deukmejian v. United States Postal Serv.*, 734 F.2d 460, 462 (9th Cir.1984).

Although the doctrine of deference and its limits are well established (if sometimes inconsistently applied), a variety of significant subsidiary questions are unsettled. It is not clear, for example, what sorts of statements emanating from an agency are to be considered by the court as "agency interpretations." It is in the nature of a complex administrative bureaucracy to issue a variety of reports, releases, opinions, advisory letters, and other similar statements in performing its task. Statements issued range from formal written pronouncements published in the Federal Register through interpretations from top administrators to letters penned by the lowest-level employee. Although common sense tells us that the utterance of a lower-echelon agency employee should not be accorded weight equal to the formal interpretation of an agency chief, the case law does not suggest clear standards by which to distinguish between the different types of statements.

Certainly a formal agency interpretation dispensed from the agency's national headquarters and intended to apply nationally constitutes an agency interpretation. *See Miller v. Youakim*, 440 U.S. 125, 144–45 n. 25, 99 S.Ct. 957, 968–69 n. 25, 59 L.Ed.2d 194 (1979). Moreover, a consistent practice by the agency may also be found to constitute an administrative interpretation. *See Larionoff*, 431 U.S. at 872, 97 S.Ct. at 2155. On the other hand, some courts have ruled that "non-institutional" opinions, such as informal letters by agency staff or interpretations by an agency attorney, are entitled to little, if any, deference. *See, e.g., Pennzoil Co. v. United States Dept. of Energy*, 680 F.2d 156, 161–62 n. 8, 171 (Temp.Emer.Ct.App.1982). Similarly, in *Miller v. Youakim*, 440 U.S. at 144–45 n. 25, 99 S.Ct. at 968–69 n. 25, the Supreme Court distinguished between an interpretation by a regional agency official and a national interpretation. The court indicated that the statement by the regional official did not reflect an official position because it was "not approved by [the agency's] General Counsel or by any departmental official in the national office." *Id.*

*Miller* suggests that an opinion that has not been approved by an agency's national office does not constitute an official agency interpretation. Nonetheless, the Ninth Circuit has deferred to opinions that apparently received neither top level approval nor had national application. For example, in *California v. FHA*, 561 F.2d 731, 733–34 and n. 4 (9th Cir.1977), decided before *Youakim*, the court treated a single affidavit submitted by the administrative manager of a state division office of the Federal Highway Administration as an official agency interpretation. *See also Medberry v. Hegstrom*, 786 F.2d 1389, 1391 (9th Cir. 1986), ("great deference" given to the interpretation of an agency regulation set forth in the agency's *amicus curiae* brief).

The absence of a consistent standard by which to determine whether a statement issued by the agency is an official agency interpretation makes it difficult for a district court to decide when to defer to purported agency opinions voiced by its staff. Notwithstanding the absence of clearly articulated guidelines, it appears fair to state that the court must give great weight to the pronouncements emanating from an agency's national office which are intended to provide guidance to an agency nationwide, and at least some consideration to other statements. With these standards in mind, I turn first to an examination of the regulatory scheme, and then to the issues tendered by the instant litigation.

IV

THE REGULATORY SCHEME

This nation's earliest settlers were political and religious refugees. Given that historical reality, it should hardly be surprising that the United States has maintained a

longstanding policy of providing refuge to aliens fleeing their homelands because of persecution. *See INS v. Stevic,* 467 U.S. 407, 414–20, 104 S.Ct. 2489, 2493–96, 81 L.Ed.2d 321 (1984). The Refugee Act of 1980, Pub.L. No. 96–212, 94 Stat. 102 (codified in scattered sections of Title 8 of the United States Code (1982)), is a continuation of that policy. It was enacted to provide "statutory meaning to our national commitment to human rights and humanitarian concerns" by conforming existing law to refugee provisions contained in the United Nations Convention Relating to the Status of Refugees. *Bolanos-Hernandez v. INS,* 767 F.2d 1277, 1281 (9th Cir.1984). Section 208(a) of the Refugee Act of 1980, 8 U.S.C. § 1158(a) (1982), directs the Attorney General to establish a procedure by which an alien may apply for political asylum [8]; the Attorney General has complied with that directive by publishing 8 C.F.R. § 208 (1986).

The Refugee Act does not address the question of whether political asylum applicants may work in the United States while their applications are in process, nor does it instruct the Attorney General to adopt regulations pertaining to employment authorization.[9] Nonetheless, pursuant to 8 U.S.C. § 1158(a) and 8 U.S.C. § 1103,[10] the Attorney General, through the Commissioner of the INS, has published two regulations permitting the district director of the INS to grant work authorization to those aliens awaiting the determination of their political asylum applications.[11] *See Employment Authorization,* 45 Fed.Reg. 19563 (1980). 8 C.F.R. § 109.1(b)(2) provides that "[a]ny alien who has filed a non-frivolous application for asylum pursuant to Part 208 of this chapter may be granted permission to be employed for the period of time necessary to decide the case." 8 C.F.R. § 208.4 provides that "[u]pon the filing of a non-frivolous I–589, the district director may, in his discretion, grant a request by the applicant for employment authorization." Once granted, employment authorization may be revoked under some circumstances. Pursuant to 8 C.F.R. § 109.2(a), "[e]mployment authorization granted under § 109.1(b) of this part may be revoked by the district director when it appears that one or more of the conditions upon which it was granted no longer exist, or for good cause shown." The sum effect of these regulations is to provide opportunity for employment authorization and to restrict the circumstances under which such authorization may be revoked.

---

**8.** 8 U.S.C. § 1158(a) provides that "[t]he Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title."

**9.** The commitment of the United States to provide asylum to refugees does not necessarily require the Attorney General to promulgate regulations permitting asylum applicants to work while they are awaiting a decision on the application. Plaintiffs have not identified any statute conferring upon asylum applicants the right to work, and it has been held that an alien does not have a constitutional right to work. *Pilapil v. INS,* 424 F.2d 6, 11 (10th Cir.), *cert. denied,* 400 U.S. 908, 91 S.Ct. 152, 27 L.Ed.2d 147 (1970); *but see Nat'l Center for Immigrants Rights,* 743 F.2d at 1371 n. 2 (detained aliens may have protected liberty interest under the Fifth Amendment in working until deportability

is determined in a due process hearing) (dicta). The commentary to the regulations expresses the view of the INS that "[e]mployment in the United States is not an inherent right of ... aliens [applying for political asylum]." *Employment Authorization to Aliens in the United States,* 46 Fed.Reg. 25080 (1981).

**10.** 8 U.S.C. § 1103(a) provides in pertinent part that the Attorney General "shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter."

**11.** 8 U.S.C. § 1103(a) authorizes the Attorney General to delegate "to any officer or employee of the Department of Justice in his discretion any of the duties and powers imposed upon him in this chapter." The Commissioner of the INS "shall ... exercise or perform any of the authority, functions, or duties conferred upon the Attorney General by the [immigration laws], including the authority to issue regulations." 28 C.F.R. § 0.105(b) (1985).

The INS may not have been required to enact regulations permitting aliens to work while awaiting a decision on their political asylum applications. Nonetheless, once promulgated, the agency is required to comply with its own regulations, *Confederated Tribes and Bands of Yakima Indian Nation v. Fed. Energy Regulatory Comm'n*, 746 F.2d 466, 474 (9th Cir.1984), *cert. denied*, 471 U.S. 1116, 105 S.Ct. 2358, 86 L.Ed.2d 259 (1985), since a regulation is binding on the agency until properly repealed. *Flores v. Bowen*, 790 F.2d 740, 742 (9th Cir.1986).[12]

## V

## DISCUSSION

Plaintiffs seek (1) an order restraining the INS from denying any work authorization request unless (a) the asylum application is frivolous, or (b) the plaintiff does not have an economic need for the authorization; (2) an order to reconsider the applications for work authorization of those plaintiffs whose requests were denied; (3) an order requiring the INS to provide written findings of fact and conclusions of law stating the reasons for the denial of any of plaintiffs' employment authorization requests; and (4) an order restraining the INS from revoking previously granted employment authorization unless the conditions under which the authorization was issued no longer exist.[13]

**12.** Neither party claims that the regulations were improperly promulgated.

**13.** Plaintiffs initially sought the following additional preliminary relief on behalf of the individuals: (1) an order requiring the INS to process within thirty (30) days (presumably from the date of any order) the employment authorization requests of those plaintiffs who had not had their applications acted upon; and (2) an order mandating the INS to issue work authorizations to the two plaintiffs whose asylum applications had been granted. The INS has now processed the asylum requests of all the named plaintiffs, and issued work authorization to those aliens who were granted political asylum. Accordingly, the requests are moot as to the named plaintiffs.

I turn first to the central controversy of this litigation, the district director's denial of the work authorizations.

### A. *Denial of Work Authorization*

The INS rejected the work authorization requests of seven of the named plaintiffs.[14] Plaintiffs contend that the district director abused his discretion by considering a number of impermissible factors in his denial of the requests.

#### 1. *Balance of Hardships/Irreparable Harm*

The first step in deciding whether to grant a preliminary injunction is to assess the nature of the relative hardships that will be suffered if the relief is not granted. The INS argues that plaintiffs who have been denied work authorization suffer no "unusual" hardships because any harm suffered prior to action on their asylum applications is solely economic in nature. The INS notes in passing that all the plaintiffs have managed to somehow "get by" up until now despite the fact that many have not been permitted to work legally. The INS position is at odds with the law in this circuit.[15]

In *Nat'l Center for Immigrants Rights*, 743 F.2d at 1369, the court found that "[t]he hardship [to aliens] from being unable to work to support themselves and their dependents ... is beyond question." That some of the plaintiffs have been able to rely on relatives for transitional support does not mitigate the seriousness of the

Relative to plaintiffs' request for an order directing the district director to reconsider the applications that were denied, the government has represented that it will reconsider without court order those requests. *See* 8 C.F.R. § 103.5 (1986). In view of the government's position, an order granting the plaintiffs' request for mandatory relief is unnecessary.

**14.** Juan Jose Fuentes, Wai Hung Yew, Jose Argumedo-Trujillo, Manuel Pineda Pedroza, Marlon Perez Reynosa, Eduardo Camacho Reynosa, and Carlos Chavez-Pacas.

**15.** Because the considerations here are equitable, I must also observe that in addition to being out of sympathy with this circuit's law, the position does not do much to enhance defendants' reputation for common decency.

hardship. *See Leschniok v. Heckler*, 713 F.2d 520, 523–24 (9th Cir.1983) (support from relatives did not lessen hardship for social security recipient whose disability benefits had been terminated). The hardship is compounded by the fact that without work authorization, many of the aliens have no choice but to work illegally. I am hard pressed to see how placing a refugee in a position where he or she must break the law to survive during the years it may take for a decision on a political asylum application *cannot* be considered an irreparable hardship.[16]

On the other hand, the hardship to the INS appears to be minimal. The burden that would result from restraining the INS from considering certain factors in determining whether to grant work authorization is light. *See Nat'l Center for Immigrants Rights*, 743 F.2d 1365 (minimal hardship to INS when ordered not to apply regulations). In fact, the INS has failed to identify in its brief any hardship that it will suffer if the preliminary injunction issues.

I conclude that the INS denials of work authorization tip the balance of hardships sharply in favor of plaintiffs. Under these circumstances, I must determine whether plaintiffs have a "fair chance of success" on the merits.

### 2. The Merits

A number of factors entered into the decisions to deny the requests for authorization, including the perceived strength of the asylum applications, the State Department's recommendation that the asylum application be denied, the initial decision of the district director to deny the asylum application, the manner of entry into the United States, the opportunity and failure to take safe haven in a country other than the United States, and the applicant's obligation to financially support family members. To determine whether the district director's consideration of any of these factors was impermissible, I must first examine the nature and scope of the district director's discretion.

#### a. The Scope of the District Director's Discretion

The INS has stipulated that all of the plaintiffs in this action have filed non-frivolous asylum applications. The issue is therefore whether the district director acted within the scope of his discretion in denying the requests for work authorization.[17]

As a general matter, discretion in the administrative context provides the decision-maker with freedom to exercise his or her best judgment in reaching a decision. *Cf. Hope v. Int'l Bhd. of Elec. Workers, Ninth Dist.*, 785 F.2d 826, 831 (9th Cir.1986) (discretion of district court). Indeed the development of the notion of discretion in the administrative context is coextensive with the development of administrative bodies and the reason they came into existence in the first place. The perceived need for administrative agencies arose in response to the development of complex technology and the economic problems engendered by them. *See generally* 1 K. Davis, *Administrative Law Treatise* §§ 1:7–1:9 (2d ed. 1978). Recognition that

---

16. An alien who engages in unauthorized employment is deportable, 8 U.S.C. § 1251(a)(9) (1982), and may not at a later date be considered for adjustment of status. 8 U.S.C. § 1255(c) (1982). Because the right of political asylum applies equally to excludable and deportable aliens, those sections apparently do not apply to asylum applicants. *See Jean v. Nelson*, 711 F.2d 1455, 1507 (11th Cir.1983). Nonetheless, the record indicates (and the INS has conceded) that the INS considers illegal work in this country a negative factor in determining whether to grant work authorization and, for that matter, in making political asylum decisions.

17. Both section 109.1(b)(2) and section 208.4 require the filing of a non-frivolous application before the work authorization request is considered. Section 208.4 expressly provides that once a non-frivolous application is filed, the district director has discretion to grant employment authorization. While there is no such explicit reference to discretion in section 109.1(b)(2), the history of that rule makes clear that, after an initial determination that the application is non-frivolous, a grant of employment authorization under section 109.1(b)(2) is similarly a matter of administrative discretion. *See* 46 Fed.Reg. 25080.

these developments required government regulations was accompanied by a recognition that both the technology and the economic problems were so varied that Congress could not efficiently address the problem through legislation. Accordingly, Congress created agencies to regulate, and provided them with general policy and goals, leaving to each agency the application of those principles and goals to individual factual situations. Those perceptions simply required that Congress provide the agency with flexibility to examine, identify and resolve particular fact patterns in light of congressional policy; hence, the notion of discretion.

While the exercise of discretion necessarily requires substantial latitude in rendering a judgment, discretion is not without its limits. On the contrary, to insure that Congress rather than the executive exercises national legislative power[18], discretion must be exercised within the limits of the applicable legal standards. *See Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 19, 103 S.Ct. 927, 938, 74 L.Ed.2d 765 (1983). As I stated in another context, " 'discretion' imparts notions of individualized, not standardless, decisionmaking ... [The] exercise of discretion is ex consulto. That is, it should be an informed decision, reached after consultation and in conformance with the general principles of applicable law." *United States v. Veon*, 538 F.Supp. 237, 243 n. 3 (E.D.Cal. 1982). Put another way, the exercise of discretion must be founded on factors that are legally relevant to the decision. *See Hope*, 785 F.2d at 831.

Phrasing the doctrine in terms of the Administrative Procedure Act, an exercise of discretion not in accordance with the purpose of the statute or which frustrates legislative intent is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and thus must be held "unlawful and set aside." 5 U.S.C. § 706(2) (1982). In like fashion, if the regulations adopted by the agency pursuant to legislative authority comport with the legislative purpose, the exercise of discretion by subordinate agency officials must be in accord with the regulations and their purpose. Again, a contrary exercise of discretion would also be arbitrary and "not in accordance with law." *Id.*

Application of the principles noted above to the instant case is relatively straightforward. While the regulations under consideration permit the district director to exercise sound personal judgment in deciding whether to grant work authorization, that judgment must be founded on factors relevant to the decision. The relevance of any factor turns on the applicable law. At the very least, the district director cannot rely on factors inconsistent with the purpose of the regulation or statute.

The regulations permitting the granting of work authorization were intended to implement the statute governing political asylum, 8 U.S.C. § 1158, as well as the rest of the Immigration and Nationality Act.[19] In discussing the purpose of work authorization, the INS said simply that "employment authorization is a matter of administrative discretion because humanitarian or economic needs warrant administrative action." 46 Fed.Reg. 25080. The INS did not spell out the humanitarian or economic considerations. It is apparent, however, that the INS intended to alleviate the economic hardship for aliens who would, without the regulations, be unable to lawfully work pending the consideration of their asylum applications. The exercise of discretion must therefore be examined with that purpose in mind.

---

**18.** The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States...." *U.S. Const.* art. I, § 1. *See generally Sierra Club v. Watt*, 608 F.Supp. 305, 329 (E.D.Cal.1985) (discussion of the separation of powers doctrine in the context of administrative rulemaking).

**19.** 8 C.F.R. § 208.4 was promulgated expressly as a procedure within the context of the political asylum process. 8 C.F.R. § 109.1(b)(2), while referring to the asylum process, was issued within the context of employment authorization in general, and is apparently not an asylum "procedure."

Plaintiffs are of the view that in evaluating whether or not to grant work authorization, the INS is limited to determining whether an alien who has filed a non-frivolous asylum application has economic need. Plaintiffs reason that since all of the plaintiffs have demonstrated economic need, none of the requests should have been denied. Economic need is concededly an important, perhaps central, factor for the INS to consider in examining work authorization requests. However, neither the language nor the history of the regulations suggest that economic need is the only relevant criterion. In fact, the regulations suggest otherwise.

An initial version of section 109.1(b)(2) permitted the district director to grant employment authorization "provided the alien establishes to the satisfaction of the district director that he is financially unable to maintain himself (and family, if any) without employment." 45 Fed.Reg. 19564. The proviso was deleted from the final regulation. In its commentary, the INS explained:

> There was opposition expressed by several commenters [sic] for the showing of economic need as a prerequisite to work authorization; they contend that such a requirement will unduly burden the alien and Service. To alleviate this burden the regulation has been amended to provide for a simple statement to be submitted by the alien attesting to his/her assets, income and expenses to be used by the district director in granting work permission.

46 Fed.Reg. 25080. The INS went on to explain that the regulation incorporated the Community Services Administration's poverty guidelines to "overcome objections to the absence of articulated standards or guidelines." *Id.* The changes are found in 8 C.F.R. § 109.1(c) (1986), which provides that:

> Title 45—Public Welfare, Poverty Income Guidelines, 45 C.F.R. § 1060.2 shall be used as the basic criteria to establish economic necessity for employment authorization *where the alien's need to work is a factor.*

(Emphasis added).

 It is not entirely clear whether the final rule applies to work authorization for political asylum applicants under section 109.1(b)(2), which in final form lacks any reference to financial need, or whether it applies only to those regulations which specifically require a showing of economic need before authorization may be granted. *See* 8 C.F.R. §§ 109.1(b)(4), 109.1(b)(5), and 109.1(b)(7). In any event, section 109.1(c) expressly applies only when "economic necessity ... is a factor." This suggests that in those cases where economic need is a permissible consideration, there may exist other relevant factors. Moreover, of course, the district director has a whole range of statutory duties and there is no apparent reason why consideration of those duties, when not inconsistent with the policies underlying the Refugee Act, would not be proper. I conclude that the plaintiffs' narrow interpretation cannot be accepted and that the district director is not limited to an evaluation of economic need in exercising his discretion.

### b. *The Individual Factors*

With the background described above, I now turn to the individual factors relied upon by the district director to determine whether they are relevant to the denial of work permission.[20]

#### (1) *Strength of the Asylum Application*

Three plaintiffs[21] were denied work authorization after a preliminary determination by the district director that their political asylum applications were without sub-

---

**20.** As I explained at the hearing, once having determined that the district director is not limited to economic need in examining the scope of discretion, I cannot address the universe of possible factors that may legitimately influence his decision. Instead, I can only consider those factors actually relied upon by the district director to determine whether they were relevant in view of the statutory and regulatory scheme.

**21.** Juan Jose Fuentes, Jose Argumedo-Trujillo, and Marlon Perez Reynosa.

stantial merit. Others [22] were denied authorization after the district director received an advisory opinion from the Bureau of Human Rights and Humanitarian Affairs ("BHRHA") of the Department of State recommending that the asylum application be denied. *See* 8 C.F.R. § 208.7 (1986). In denying employment authorization for each of these plaintiffs, the district director admittedly considered the strength of the asylum applications. Plaintiffs' position is that after the initial determination that the application for political asylum is non-frivolous, the INS abuses its discretion if it considers the merits of the asylum claim. The district director, on the other hand, argues that he may consider a wide range of factors, including the substantive merits of the asylum application.

Both sections 109.1(b)(2) and 208.4 permit the district director to grant work authorization only after the alien has filed a "non-frivolous" asylum application. A "frivolous" application is one with "little weight or importance, not worth noting, slight, given to trifling, marked with unbecoming brevity, [or] patently without substance." *Interpreter Releases* at 522 (June 29, 1984). A non-frivolous application is one "where a substantive claim of persecution is made." 46 Fed.Reg. 25080. The issue is whether after the district director has determined that the asylum application is non-frivolous he may consider the merits of the application in the exercise of his discretion.

22. Wai Hung Yew, Manuel Pineda Pedroza, Eduardo Camacho Reynosa, and Carlos Chavez-Pacas.

23. As far as the court is aware, section 208.4 always mandated only a "non-frivolous" application. *See Aliens and Nationality; Refugee and Asylum Procedure,* 45 Fed. Reg. 37394 (1980).

24. The INS initially interpreted the regulation to mean that "[t]he sole factor to be considered on a request for employment authorization ... is whether or not the application for asylum is 'frivolous'. This is true for applications filed initially before the district director or immigration judge." *Interpreter Releases* at 522 (June 29, 1984).

The history of the regulations does not shed a great deal of light. Section 109.-1(b)(2) went through a number of drafts before the INS settled on the final form. In its original form, section 109.1(b)(2) stated that an alien may be granted work authorization "provided the [asylum] application is prima facie approvable...." 45 Fed.Reg. 19564.[23] A number of commentators objected that the "prima facie approvable" prerequisite was unfair, so the regulation was "changed to read 'non-frivolous' application so as to include any application for asylum where a substantive claim of persecution is made." 46 Fed.Reg. 25080. It is unclear from the agency commentary whether the drafters wanted to preclude consideration of the merits after a determination that the asylum application was non-frivolous, or whether they only intended to reduce the threshold showing required before the merits of the work authorization request were considered. The regulations can be read either way.[24]

Although not spelled out in the history of the regulations, it seems apparent that a threshold eligibility requirement was necessary to discourage aliens from filing unfounded political asylum applications for the sole purpose of obtaining work authorization. If the regulations contained no eligibility prerequisite, every alien illegally in the United States would have to be considered by the district director for employment authorization upon the filing of an asylum application, even if the asylum claim was patently frivolous. The requirement that the alien file a "non-frivolous"

The INS subsequently observed that a "finding that an asylum application is non-frivolous does not ... automatically entitle the applicant to employment authorization. That finding, non-frivolous, merely makes the applicant eligible to be considered and the decision on employment authorization is within the discretion of the district director to grant or deny on the merits of the individual case." *INS Memo to All Regional Commissioners* (August 28, 1984).

As I noted above, the varying later interpretation is entitled to no particular deference. *See* section III, *supra.* Moreover, given the varying interpretations, it is not possible to rely on a consistent practice of the agency as constituting a fixed administrative interpretation.

asylum application, then, is a method of "weeding out" those aliens who file applications solely as a pretext for obtaining work authorization.

Once the district director determines that the asylum application is non-frivolous, thereby weeding out those who have filed applications solely as a pretext for obtaining work authorization, the rationale for considering the merits of the asylum application diminishes. Indeed, upon careful consideration, it appears to the court that the consideration of the merits frustrates the regulatory scheme. There can be no doubt that the strength of every asylum claim will vary. The purpose of sections 109.1(b)(2) and 208.4 is to alleviate the economic hardship for aliens with non-frivolous asylum claims while those claims are in the process of adjudication, a complex and time-consuming procedure.[25]

The establishment of such a detailed process indicates an implicit recognition that the outcome of the asylum claim cannot be determined until the process is completed, after the evidence has been fully considered and review taken. The district director's disposition of requests for employment authorization on the basis of his own tentative assessment of the strength of the asylum claim, or on the basis of an advisory opinion of the BHRHA[26], disregards the underlying assumption of the asylum procedure, that is, that the merits of the asylum claim cannot be finally resolved until the procedure is completed. Rejecting the authorization request on the basis of a preliminary evaluation of the merits of the claim presents the distinct risk that an alien with a meritorious application may be deprived of permission to work lawfully during the pendency of the claim because of the district director's incorrect preliminary evaluation. Such a result is plainly inconsistent with the regulations.[27]

Permitting the district director to reject the work authorization requests of bonafide asylum applicants on the strength or weakness of the application would also appear to contravene the intent of the political asylum statute. Congress has specifically established a right to apply for political asylum and to have the application formally adjudicated. See 8 U.S.C. 1158. The rejection of an applicant's request may, and inevitably will, discourage some aliens without economic support from pursuing the asylum claim through the lengthy asylum procedure. Alternatively, if the alien does not abandon the asylum claim, he or she may be required to work illegally to survive which, as conceded by the district director at oral argument, may be considered by the INS as a negative discretionary factor in adjudicating the asylum request. In either case, the goal of the political asylum statute is frustrated.

25. An alien seeking political asylum must initially file an application with the district director. 8 C.F.R. § 208.3(a) (1986). The district director renders a judgment on the asylum application after formally considering the evidence. See 8 C.F.R. §§ 208.6, 208.7, and 208.8 (1986). While the decision of the district director is technically non-appealable, 8 C.F.R. § 208.8(c) (1986), the alien may renew his or her application for asylum in exclusion or deportation hearings. 8 C.F.R. § 208.9 (1986); see also 8 C.F.R. § 208.3(b) (1986). After the exclusion or deportation hearing, the alien may appeal in some circumstances to the Board of Immigration Appeals. 8 C.F.R. § 3.1(b) (1986). The alien may ultimately petition for review to the United States Court of Appeals. 8 U.S.C. § 1105a(a). The entire process from the filing of any asylum application through appeal to the United States Court of Appeals often takes years. See Sudomir v. McMahon, 767 F.2d 1456, 1467 (9th Cir.1985) (Canby, J., dissenting)

(adjudication of asylum application may take three to six years to complete).

26. The Ninth Circuit has found State Department advisory letters to be of questionable reliability. See Kasravi v. INS, 400 F.2d 675, 677 and n. 1 (9th Cir.1968).

27. It is of course true that the existence of a right to appeal does not always require that the effect of a decision be stayed. Thus, trial judges can, under appropriate circumstances, incarcerate defendants found guilty by a jury, despite a right of appeal. Nonetheless, the preliminary determinations at issue here do not carry the kind of conviction that a determination after trial does. Perhaps more to the point, however, is that denying work authorization may well have the effect of precluding the possibility of the applicant sustaining himself or herself during the review process.

The INS argues that the "non-frivolous" standard refers to a threshold determination and does not preclude subsequent consideration of the merits. Under the theory, any application falling below the threshold (i.e., a frivolous application) would automatically be excluded from consideration, while one meeting the threshold requirement (i.e., a non-frivolous application) would be considered, but not necessarily approved. By disposing of the frivolous applications at the outset, the district director would presumably be able to examine the applications with greater care.[28]

There are at least two problems with the theory. First, as discussed above, the approach is inconsistent with the regulations and the statutory scheme because it disregards the nature of work authorization and the function of the asylum procedures in adjudicating applications of necessarily varying strengths. More fundamentally, there is no indication in the record that the INS has ever applied the two-step process. To the contrary, the evidence suggests that the district director did not distinguish between an initial finding of "non-frivolous" and any subsequent consideration of the merits, and in fact may have ignored the threshold standard entirely.[29]

In fact, it is the policy of the INS to decide the employment authorization request only at the time of the interview with the alien. *Interpreter Releases* at 523 (June 29, 1984). Although unclear from the record, the district director apparently does not review the application prior to the interview to determine whether it is non-frivolous, but rather at the time of the interview proceeds directly to examine the merits of the claim under some unspecified, but surely more stringent, standard. Such

a practice appears to render the threshold standard superfluous. *Cf. United States v. Handy*, 761 F.2d 1279, 1281 (9th Cir. 1985), (a statutory provision should not be construed in such a way as to render any word superfluous). Given the evidence before the court at this time, it appears that the actual practice of the INS leaves no room for the government's interpretation.

I conclude that plaintiffs have a raised serious question as to whether the district director, after a preliminary finding that the application is non-frivolous, may consider the strength of the asylum application in deciding whether to grant or deny a request for work authorization, notwithstanding the receipt of an advisory letter from the BHRHA counseling denial or an initial decision by the district director.

#### (2) *Manner of Entry*

At least four of the plaintiffs[30] were denied work authorization because they had entered the country illegally. I noted above that in addition to his responsibilities under the Refugee Act, the district director has responsibilities under all of the immigration statutes. I also suggested that since economic need was not the sole criteria for exercising discretion under the work authorization regulations, considerations of other statutory policies in the exercise of discretion is not inappropriate. As a general proposition, the district director has as one of his duties the protection of this country's borders from illegal entry. Thus as a first matter, consideration of whether the applicant has entered the country illegally does not appear improper. Nonetheless, given the purpose of the Refugee Act and the reality facing refugees, the court believes that plaintiffs have a fair

---

**28.** While the argument is premised in part on the INS memo of August 28, 1984, *supra,* little or no deference need be accorded that administrative interpretation. *See Flint v. State of California,* 594 F.Supp. at 448 n. 6.

**29.** Plaintiffs suggest that this argument cannot be entertained by the court because it is no more than a *post hoc* rationalization of the district director's disposition. *See Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Auto.*

*Ins. Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983); *Bunker Co. v. EPA,* 572 F.2d 1286, 1292 (9th Cir.1977). In effect, I find that defendants' argument must be rejected because it does not conform to the actual practice. To that extent, plaintiffs' argument has considerable force.

**30.** Juan Jose Fuentes, Wai Hung Yew, Jose Argumedo-Trujillo, and Marlon Perez Reynosa.

ground to litigate whether consideration of the manner of entry is proper in the exercise of the district director's discretion.

■■■ It is important to put the issue in context. As a general matter, of course, an alien who enters the United States illegally is deportable. *See* 8 U.S.C. § 1251(a)(2) (1982). Congress recognized, however, that refugees fleeing from religious or political persecution present a special case relative to illegal entry. As a practical matter, a refugee may not seek asylum until he or she reaches what is perceived by the refugee as a safe haven. Accordingly, an alien may be granted political asylum irrespective of status, 8 U.S.C. § 1158(a), and the right of asylum applies equally to excludable and deportable aliens. *Jean v. Nelson,* 711 F.2d at 1507.[31]

In sum, it appears to the court that since political asylum may be granted to an alien irrespective of manner of entry, it is inconsistent to provide that the manner of entry is relevant to a determination relative to work authorization. An alien who has reached the United States by stowaway is not to be treated differently from other asylum applicants. *Yiu Sing Chun v. Sava,* 708 F.2d 869, 874–75 (2d Cir.1983). I conclude that the district director's consideration of an alien's manner of entry in deciding whether to grant or deny the work authorization requests raises serious questions of law.

### (3) *Failure to Seek Safe Haven Elsewhere*

■■■ A number of plaintiffs[32] were denied work authorization after the district director found that they had failed to seek apparent safe haven in a country other than the United States. Under 8 C.F.R. § 208.8(f)(2) (1986), asylum may be denied when "it is determined that there is an outstanding offer of resettlement by a third nation where the applicant will not be

subject to persecution and the applicant's resettlement in a third nation is in the public interest." There is no indication in the record that any of the plaintiffs had an outstanding offer of resettlement, and the denial letters do not address why such resettlement might be in the public interest. If every Central American refugee could be denied work authorization on the ground that he or she failed to seek "apparent" safe haven while traversing Mexico, virtually no such refugee would be granted permission to work. *Cf. Garcia-Ramos v. INS,* 775 F.2d 1370, 1374–75 (9th Cir.1985) ("We do not find it inconsistent with a claimed fear of persecution that a refugee, after he flees his homeland, goes to the country where he believes his opportunities will be best"). Such a result is plainly inconsistent with the purpose of the regulatory scheme. I conclude that plaintiffs have established a fair chance of success on the issue of whether the district director may deny work authorization on the ground that the alien failed to seek safe haven in a third country, unless he finds that there is an outstanding offer of resettlement and resettlement is in the public interest.

### (4) *Absence of Families to Support*

■■■ Two of the plaintiffs[33] were denied work authorization in part because they were not responsible for the welfare of anyone but themselves. The INS does not even attempt to explain how the absence of a family to support is relevant to work authorization. Whether or not there exists a family to care for, the individual refugee still needs to eat. The denial letters from the INS did not find that the aliens lacked economic need. I conclude that plaintiffs stand a fair chance of demonstrating that the district director abused his discretion in

---

**31.** In addition, the Attorney General is specifically precluded from deporting any alien to a country where the alien's life would be threatened because of race, religion, nationality, membership in a particular social group, or political opinion. U.S.C. § 1253(h)(1) (1982).

**32.** Eduardo Camacho Reynosa, Carlos Chavez-Pacas, Juan Jose Fuentes, Jose Argumendo-Trujillo, and Marlon Perez Reynosa.

**33.** Eduardo Camacho Reynosa and Carlos Chavez-Pacas.

considering whether the two plaintiffs were responsible for the support of others.

### B. *Revocation of Work Authorization*

Two of the plaintiffs were initially granted work authorization, and subsequently had their authorizations revoked. The district director revoked the authorization of both Jose Fernando Diaz and Teresa Duarte after deciding that they were not refugees within the meaning of section 101(a)(42)(A) of the Immigration and Nationality Act. *See* 8 C.F.R. § 208.8(f). Plaintiffs seek a preliminary injunction restraining the INS from revoking any previously granted work authorization until the alien has exhausted all appeals.

#### 1. *Balance of Hardships/Irreparable Harm*

The hardship to applicants who have had their employment authorizations terminated after a preliminary rejection of their asylum claims is no less than the hardship to those who have had their work authorizations denied at the outset of the process. In either case, the hardship for those who cannot otherwise support themselves is severe. In contrast, as I discussed *supra,* the hardship to the INS is slight. I conclude that the balance of hardships tips sharply in favor of plaintiffs.

#### 2. *The Merits*

It is plaintiffs' position that once granted, work authorization cannot be revoked until an alien has exhausted all avenues of review available to political asylum applicants, and the claim has been rejected. Plaintiffs must demonstrate a fair chance of prevailing on this issue.

To determine whether the district director's decision to revoke the work authorizations of Diaz and Duarte contravened the regulations, I must examine not only the regulations governing revocation, but the regulation providing for the grant of work authorization. 8 C.F.R. § 109.1(b)(2) provides that the grant of authorization will be "for the period of time necessary to decide the case." That is, the grant of employment authorization is valid only until the case is "decided," notwithstanding any provision relative to revocation. Employment authorization may be revoked before the period expires under 8 C.F.R. § 109.2 "when it appears that one or more of the conditions upon which it was granted no longer exist, or for good cause shown." [34]

Plaintiffs contend that the "period of time necessary to decide the case" refers to the period of time it takes to exhaust all stages of the political asylum decision, including review in the federal courts. Although plaintiffs' interpretation of the regulation is consistent with the language of the regulations, the INS has expressed the view that employment authorization "shall be given for the period of time necessary for the district director or immigration judge to initially decide the case." *Interpreter Releases* at 523 (June 29, 1984). While the INS interpretation may be read as a linguistically possible, if strained, interpretation of the language of section 109.1(b)(2) [35], it appears to be erroneous and inconsistent with the statutory and regulatory scheme.

As explained above, there is a strong argument that the district director may not consider the merits of a non-frivolous asylum application in deciding whether to grant or deny work authorization. The revocation of employment authorization after a denial of political asylum by the district director pursuant to 8 C.F.R. § 208.-8(f) (1986) is nothing more than a rejection based on the merits of the asylum claim and is, therefore, impermissible. *See* section VA2(b)(1), *supra.* In addition, as discussed previously, the termination of work

**34.** There is no specific regulation addressing the length of time a work authorization granted under 8 C.F.R. § 208.4 is to remain in effect. For purposes of the preliminary injunction, I assume that the standards applicable to section 109.1(b)(2) apply equally to section 208.4.

**35.** Where an agency's interpretation "is linguistically possible and makes logical sense, there is no reason not to follow it," provided it is "consistent with the congressional purpose." *Flint v. State of California,* 594 F.Supp. at 448 and n. 6.

authorization before all avenues of review are exhausted may discourage bona-fide asylum applicants from pursuing a legitimate claim through the established procedures, or promote unlawful employment. Either result is inconsistent with the statute and the regulatory scheme and, therefore, unacceptable.

Moreover, permitting the district director's decision to mark the line of demarcation appears inconsistent with the explicit terms of the regulations. As noted above, section 109.2 provides that authorization may not be revoked unless one or more of the conditions upon which it was granted no longer exist, or for good cause shown. The district director's negative determination does not meet the regulatory prerequisite. At the time the work authorization was initially granted, there had been no determination that the asylum claim was meritorious; there had only been a determination that it was not frivolous. That continues to be the exact state of affairs after the district director's determination.[36]

■ All of the above strongly suggests in view of the purpose of the asylum procedure and work authorization regulations, the revocation of employment authorization prior to final adjudication of the asylum application is unreasonable. Mindful of my obligation to construe regulations in such a way as to uphold the regulation if possible, see United Telecommunications, 589 F.2d at 1390, I find that there is a fair ground to litigate whether the "decision" in section 109.1(b)(2) refers to the final decision in the asylum process, that is, the judgment by the United States Court of Appeals. Accordingly, I conclude that plaintiffs have raised a serious question as to whether employment authorization may be revoked before all avenues of appeal have been exhausted or abandoned. At this preliminary juncture, there is no evidence that the conditions under which the authorizations had been granted had changed, or that any other good cause for revocation existed.

## C. Written Findings of Fact and Conclusions of Law

Plaintiffs seek a mandatory injunction requiring the INS to provide written findings of fact and conclusions of law stating the reasons for the denials. In seeking mandatory relief, the burden of the plaintiffs increases sharply. The court is to be "extremely cautious" in granting relief that goes beyond maintaining the status quo pendente lite. Martin v. Int'l Olympic Comm., 740 F.2d 670, 675 (9th Cir. 1984). A mandatory preliminary injunction "should not be issued unless the facts and law clearly favor the moving party." Anderson v. United States, 612 F.2d 1112, 1114 (9th Cir.1980).

■ Plaintiffs have failed to satisfy the stringent standards for mandatory relief. For one thing, the hardship suffered by plaintiffs resulting from any inadequate written findings does not appear to be substantial, and certainly does not approach the hardship resulting from an alien's inability to work legally. Equally important, the district director did provide written findings to the plaintiffs. The district director wrote to each plaintiff, or to his or her representative, explaining why the request for permission to work was being denied or revoked. Although occasionally terse, the explanations appear to be sufficient to satisfy any due process concerns. Accordingly, the request for an order requiring written findings of fact and conclusions of law is denied.

---

**36.** Moreover, constitutional standards are implicated. Once a regulation permitting the grant of employment authorization to political asylum applicants is promulgated and the alien actually receives authorization to work, the right may not be revoked arbitrarily or unreasonably. See Goldberg v. Kelly, 397 U.S. 254, 261–62, 90 S.Ct. 1011, 1016–17, 25 L.Ed.2d 287 (1970). It is, of course, fundamental that where possible, the regulations should be construed to avoid constitutional questions. Cf. American Communications Association v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925 (1950) (construing statute).

CONCLUSION

For the reasons explained above, IT IS ORDERED that:

1. The district director is preliminarily enjoined from considering the strength of the asylum application in deciding whether to grant work authorization after the initial determination that the application is non-frivolous.

2. The district director is preliminarily enjoined from considering an alien's manner of entry in deciding whether to grant work authorization.

3. The district director is preliminarily enjoined from denying work authorization on the ground that the alien failed to seek apparent safe haven in a third country.

4. The district director is preliminarily enjoined from denying work authorization because the alien is not responsible for the economic support of others.

5. The district director is preliminarily enjoined from revoking work authorization until the adjudication process for the asylum claim has been completed, or abandoned, or "it appears that one or more of the conditions upon which it was granted no longer exist, or for good cause shown." 8 C.F.R. § 109.2.

6. Plaintiffs' application for a preliminary injunction requiring the INS to provide written findings of fact and conclusions of law stating the reasons for any denial of work authorization is DENIED.

IT IS SO ORDERED.